**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EWA SOKOLA,<br><br>               Plaintiff,<br><br>     -against-<br><br>KAJA SOKOLA,<br><br>            Defendant. | Civil Case No.: 25-cv-10689<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ewa Sokola ("Plaintiff"), by her attorneys Daniel J. Schneider, Mark J. Dimenna and Offit Kurman, P.A., as and for her Complaint herein, upon both personal knowledge and upon information and belief, and as against Kaja Sokola ("Defendant") asserts and alleges the following:

## THE PARTIES

1.      Plaintiff is an adult individual who is a citizen and national of the Republic of Poland and at all times relevant to this action has maintained a domicile in Poland and currently resides there.

2.      Plaintiff is a licensed cardiologist specializing in heart health, working at Lumina Cordis Heart Centre in Wrocław, Poland.

3.      Defendant is an adult individual who at all times relevant to this action has resided in New York, New York.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendant, in that Defendant resides in the State of New York in this Judicial District, the Plaintiff resides in Poland, and the amount in controversy between the Parties exceeds $75,000.00.

5.    With respect to amount in controversy, Plaintiff is a cardiologist who has had regular patients throughout her career.  Since the conduct complained of herein commenced, Plaintiff's professional reputation has suffered such that she has lost referral sources as a result of Defendant's conduct.  Furthermore, she has seen a reduction in patients.  In addition, she has lost employees that streamline her practice which also causes damage.  Cumulatively, while this does not constitute an exhaustive list of categories of damage, damage in these categories is expected to exceed $75,000.00. See Scherer v. Equitable Life Assurance Soc'y of U.S., 347 F.3d 394, 397 (2d Cir. 2003).

6.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because Defendant (i) is located and resides in this District, (ii) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here in this Judicial District, and (iii) Defendant purposefully directed conduct in this District that form the basis of Plaintiff's claims.

## JURY DEMAND

7.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on each and every claim as pleaded herein.

## NATURE OF THE ACTION

8.    This is an action for defamation, slander *per se*, libel *per se* and intentional infliction of emotional distress arising out of Defendant's malicious, wrongful, provocative, and sensationalistic publications containing many false and contemptuous allegations of and concerning Plaintiff which have caused and continue to cause Plaintiff severe reputational and other damage. Plaintiff seeks monetary compensation, injunctive relief, an award of attorneys' fees and costs, and other legal and equitable relief, including, but not limited to, compensatory and punitive damages as Plaintiffs may be entitled to, stemming from Defendant's wrongful conduct.

2

9.      Plaintiff Ewa Sokola resides in Poland. Defendant Kaja Sokola is her sister.

10.     Defendant is a former runway model who, through public statements and online materials, has identified herself as a psychologist, producer, and storyteller engaged in film, writing, and public speaking.

11.     Plaintiff and Defendant have an estranged relationship and have not maintained a close familial relationship for many years. Their relationship has been marked by recurring and unresolved family disputes that were often precipitated by Defendant's alcoholism.

12.     Plaintiff, a successful cardiologist, has sought to maintain professional and personal boundaries in light of these longstanding family conflicts.

13.     Defendant is not part of Plaintiff's household or immediate family sphere and has had no involvement in Plaintiff's personal affairs for many years.

14.     Notwithstanding their estrangement, Plaintiff and Defendant have had intermittent and limited contact over the years, primarily in connection with disputes concerning the well-being of Defendant's child. That contact was limited in scope and did not reflect a close or collaborative relationship.

15.     This intermittent and limited contact eroded as a result of Plaintiff advocating for the return of Defendant's child to Poland.  The child's father was awarded custody of the child by a Polish Court, but Defendant is defied the custody order in the context of a Hague Convention proceeding, in which the Court found that Defendant had wrongfully absconded with the child, but ultimately found in her favor.

16.     Therein, Plaintiff initially testified on behalf of Defendant, based on her belief that Defendant, who has suffered serious psychiatric issues and continues to battle alcoholism, was stable, sober and competent to care for her child. As sworn to in post-trial submissions, Plaintiff

3

now contends that Defendant's lawyers pressured her and other witnesses to omit or limit discussion of Defendant's substance abuse disorder when it came to her ability to care for her child. When she realized that Defendant's alcoholism was actually once again out of control, for the child's safety she became a witness for the father to assist him in regaining custody.

17.    After Plaintiff's participation in assisting the father with his case, most recently on December 1, 2024, upon information and belief, the relationship between Plaintiff and Defendant was severed and Defendant refused to speak to Plaintiff.

18.    Separate and apart from Plaintiff, and outside the limited and sporadic contact described above, Defendant became involved in widely reported criminal proceedings and related media coverage concerning allegations she made against disgraced film producer Harvey Weinstein.

19.    Defendant's allegations concerned an encounter alleged to have occurred in or about 2006 and were incorporated into the State of New York's case during a retrial of Weinstein following the vacatur of his prior conviction.

20.    At a retrial conducted in or about April through June 2025, Weinstein faced new charges with multiple counts based on allegations made by different accusers, including a count predicated on Defendant's allegations.

21.    In advance of the retrial, Plaintiff came to believe that she was being asked to proffer incomplete or misleading testimony by the prosecution and  began speaking with Weinstein's defense lawyers.

22.    During the course of these discussions, Plaintiff realized that she was in possession of journals written by Defendant years prior that Defendant had abandoned with more than one person, and which ultimately, legitimately, came into Plaintiff's possession.

23.     During those discussions, Plaintiff came to the realization that the journals contained material relevant to Weinstein's trial and she ultimately produced most of these diaries to the Defense.

24.     At Weinstein's retrial, Plaintiff testified as a prosecution witness, having been called by the People. Plaintiff's testimony addressed her personal observations, contemporaneous knowledge, and interactions with Defendant, including events occurring in or about 2006.  It included testimony about Defendant's demeanor after leaving an encounter with Weinstein in 2006 that was likely perceived by the jury as exculpatory.

25.     Later in the trial, Defendant was called as a witness by the People. During cross-examination, defense counsel confronted Defendant with the journals and questioned Defendant regarding specific entries and omissions in her journal, including that the journal identified other individuals as having sexually assaulted Defendant, did not describe a sexual assault by Weinstein, and referenced Weinstein only in a non-assault context, and questioned whether those entries and omissions were inconsistent with Defendant's account offered at trial.

26.     At the conclusion of the retrial in or about May 2025, the jury returned mixed verdicts. Weinstein was acquitted on the count predicated on Defendant's allegations. The jury's verdict concluded the criminal proceedings as to Defendant's allegations, and the court thereafter entered judgment consistent with the verdicts returned.

27.     Following the verdict, Defendant gave interviews and made comments in which she publicly criticized Plaintiff's role in the criminal proceedings, including Plaintiff's production of Defendant's journals and Plaintiff's testimony at trial, which Defendant repeatedly characterized as a personal "betrayal."

5

28.    Defendant's comments were first reported by the New York Post in an article published on June 13, 2025, which framed Defendant's statements as blaming her sister's "betrayal" for the jury's failure to convict Harvey Weinstein on the count predicated on Defendant's allegations. In that article, Defendant was quoted as stating, *"I don't think there would be a verdict like that if my sister didn't give that journal,"* in reference to the journal's disclosure and use at trial. In that same article, Defendant erroneously told the post that she "*wrote about Weinstein's alleged rape in other diaries that she no longer has access to*." She also falsely accused Plaintiff of suppressing such evidence stating, "*She manipulated the situation and chose this one workbook*."

29.    Defendant's statements were also reported by Variety in an article published on June 14, 2025, which recounted Defendant's characterization of Plaintiff's conduct in connection with the retrial. In that article, Defendant stated: *"The devastating part was not the trial itself — it was the betrayal of my sister. I truly don't understand how she could — how anyone could do something like that*." In that article she repeats the foregoing false statements from the New York Post. Variety reported that Defendant "*had written about Weinstein's abuse in other diaries, but those were not read for the jury,*" and in the same article Defendant stated, "*My sister chose to bring this one thing from Poland that said what it said.*" The Variety article includes an additional false statement by Defendant, saying, "*My sister was trying to do a lot of harmful things to me in the past…A lot of this was correlated with money, so we didn't have — let's say — the best relationship ever.*"

30.    Defendant's foregoing comments were made notwithstanding that Plaintiff's involvement in the Weinstein retrial was limited to complying with compulsory legal process (she was served with several subpoenas), and testifying truthfully as a witness called by the People.

31.    Defendant made these statements with full knowledge that Plaintiff did not author the journal and exercised no control over where, or how, the journal was to be used by defense counsel at trial.

32.    On June 21, 2025, Plaintiff served Defendant, through counsel, a cease-and-desist letter demanding retraction of the foregoing statements, and demanding Defendant cease making further defamatory statements about Plaintiff, among other things.  No response was received.

33.    The facts described above reflect Defendant's personal reaction to the verdict and are pleaded as background and context, including with respect to Defendant's motive, knowledge, and state of mind—her malice—and as the predicate for the subsequent defamatory publications described below.

34.    On or about June 21–23, 2025,[1] shortly after the verdict and the media coverage described above, Defendant published the following statement verbatim on her Instagram account to approximately 8,000 followers:

> *I hate posting this, and I hate that situation. It's embarrasing to wash family dirt I. Front of the world, but I'm not the one who chose this path. For years I have been trying to "deal with personally" with my sister's sick betray, and jealousy. She got drunk, seduced and slept with a man that proposed to me, stoled 5 numbers of $ from my account, stoled my sons passport, collaborated with my ex husband who I escaped from because of abuse on me and my son, which was proven by court. I am along with my son here. God being gracious provided us with beautiful friends, but with the family I was born into the last straws has been pulled. I never wanted to do this. I feel hurt, I have nightmares and lock my doors on extra locks . Ewa is supposed to be a doctor- by falsification of medical documentation she should have her right to be a medical doctor taken away. She was accused of a death of a child which was hushed in my family #it ends with us #nomore #protectmyson #godhelp*

[all sic].

---

[1] Defendant's Instagram account has since been made private, and the precise date of publication is therefore not presently ascertainable.

35.    On June 21, 2025, the Daily Mail published an article about Defendant and the Harvey Weinstein trial wherein Defendant accuses Plaintiff of criminal theft, stating "She stole [Defendant's child's] passport from my house, she stole all of [Defendant's child's] IDs."

36.    Defendant is referring to an event wherein Plaintiff took the child's Polish identification card and his insurance card (not his passport ever) at the request of representatives of the Administration for Children's Services ("ACS") after Defendant had been taken into police custody for child neglect and the child had been temporarily removed from Defendant's custody. Plaintiff took those documents for the purpose of taking the child to the hospital to get him a checkup related to the neglect charge against Defendant.[2]  Plaintiff did in fact, took the child to the hospital. Defendant knew that these documents were taken related to the child's care after ACS intervention and were not stolen, and that Plaintiff never touched the child's passport.

37.    On June 23, 2025, Plaintiff served Defendant, through counsel, a second cease-and-desist letter demanding retraction of the foregoing statements and demanding Defendant cease making further defamatory statements about Plaintiff, among other things.  No material response was received.

38.    After the June 2025 media coverage and the Instagram post described above, Defendant appeared as a guest on multiple podcasts, beginning with "The Viall Files", Episode 963, entitled *Going Deeper with Kaja Sokola* (the "Viall Files Interview"), published on July 9, 2025, during which Defendant again characterized Plaintiff's conduct as a "betrayal" and repeated and expanded upon her prior accusations concerning Plaintiff.

39.    In the Viall Files Interview, Defendant asserted that Plaintiff "reached out to" and "had many meetings" with Weinstein's defense team prior to the trial; she framed Plaintiff's

---

[2] The child's polish identification card and insurance card were returned to Defendant's lawyer, upon request.

production of her journal as part of "the depth of the betrayal," stating: *"she reached out to them and had many meetings before the trial. And there was this part about my journal. She probably had about 10 or 20 journals and she chose one thing that's not even a diary. Like, you know, the depth of the betrayal and like the need to, I don't know, like destroy me*."

40.     Defendant further stated in the Viall interview that Weinstein's defense team obtained the journal "from my sister," stating: *"I kept on asking, like, how did you got it? Where did you got it? They say from my sister*."

41.     Defendant also attributed the verdict on the count predicated on her allegations to the journal and to Plaintiff, stating: *"I know for certain that this one, because the jurors were talking about this, it was the journal and her sister*."

42.     Defendant continued to frame Plaintiff's actions as motivated by jealousy and money-related grievances, stating: *"My sister, I guess, thought that I can be a milking cow for the family, for her," "There was always jealousy,"* and *"It's not the first time that she betrayed me*."

43.     Defendant then reiterated allegations materially consistent with those disseminated on Instagram, including statements that Plaintiff *"slept with a guy who proposed to me," "stole a lot of money from my bank account,"* and *"went behind my back with my ex-husband*."

44.     Defendant additionally accused Plaintiff of falsifying medical documents and transmitting them to prosecutors, stating: *"she falsified medical documents and sent them to the prosecutors who said, we can obviously see that this is made up*."

45.     When asked by the hosts whether Plaintiff had faced consequences, Defendant responded: *"I'm working on that*."

46.     On or about August 1, 2025, Defendant appeared as a guest on the Barely Famous Podcast, in an episode titled *Surviving Weinstein: Kaja Sokola's Story of Strength* (the "Barely

Famous Interview"), during which Defendant made additional statements concerning Plaintiff and Plaintiff's alleged role in Weinstein's criminal proceedings.

47.     In the Barely Famous Interview, Defendant stated that the "worst part" of the criminal case was "knowing that my sister is working with the defense," and asserted that Plaintiff was aligned with Weinstein's defense team rather than with the prosecution.

48.     Defendant further stated that Plaintiff "completely changed her testimony" between her grand jury testimony and her trial testimony and claimed that Plaintiff altered her account in order to portray Defendant unfavorably before the jury.

49.     Defendant asserted that Plaintiff testified at trial that Defendant appeared "like someone who's waiting for an Oscar," and characterized Plaintiff's testimony as perjury and a deliberate attempt by Plaintiff to undermine Defendant's credibility and to "hurt" Defendant.

50.     Defendant attributed the jury's verdict acquitting Weinstein on the count predicated on Defendant's allegations to Plaintiff and to the journal Plaintiff produced, stating in substance that the acquittal occurred "because of my sister and the journal that she gave."

51.     Defendant asserted that Plaintiff selectively provided the journal to Weinstein's defense, while withholding other diaries authored by Defendant, stating in substance that Plaintiff "just picked this one and gave this one," and implying that Plaintiff intentionally cherry-picked materials to influence the outcome of the trial.

52.     Defendant further asserted that Plaintiff's actions were motivated by money and jealousy, stating that Plaintiff "continues to try to" harm Defendant and that "money are a big part of this, of the way she acts," further attributing Plaintiff's conduct to jealousy.

53.    Defendant stated that she has ceased all communication with Plaintiff and has "no desire to talk to her again," openly framing Plaintiff as a personal adversary rather than as a neutral witness compelled to testify.

54.    On September 24, 2025, an episode of the podcast *She Pivots* entitled *"Kaja Sokola"* was published and distributed to the public (the "She Pivots Episode").

55.    In the She Pivots Episode, Defendant publicly discussed the retrial proceedings and described events she characterized as a profound personal betrayal by her older sister.

56.    Specifically, Defendant stated, in substance, that during the retrial, she learned that Plaintiff had provided Defendant's private journal to Weinstein's defense team, which Defendant described as deeply personal and destabilizing, and which she claimed required her to take a break during the proceedings to regain composure.

57.    Defendant further stated, in substance, that her ex-husband and Plaintiff were working with, coordinating with, or assisting the defense team during the retrial and that the defense used the journal as a focal point to attack Defendant's credibility and undermine her testimony.

58.    On October 15, 2025, Defendant appeared as a guest on the podcast *Really Famous with Kara Mayer Robinson*, in an episode titled *"Kaja Sokola,"* which was recorded and publicly distributed via podcast platforms and social media.

59.    During that interview, Defendant again accused Plaintiff of intentional misconduct, bad faith, and betrayal in connection with the Weinstein trial.

60.    Defendant stated that she "always had a very turbulent relationship" with Plaintiff, that "a lot of things have happened before," and that longstanding animosity between the sisters pre-dated any criminal or civil proceedings involving Weinstein.

11

61.     Defendant asserted that Plaintiff intentionally provided Defendant's journal to Weinstein's defense team rather than to prosecutors, and she further claimed that the defense "basically based their whole defense on that."

62.     Defendant also stated that Plaintiff expressly told her, "I don't believe you," and characterized Plaintiff as acting in betrayal, bad faith, and opposition to Defendant.

63.     The statements described in the foregoing paragraphs include two distinct categories: (a) specific factual assertions accusing Plaintiff of criminal conduct, professional misconduct, theft, dishonesty, and other acts of moral turpitude, which are pleaded as actionable defamatory statements that are false, verifiable, and capable of being proven true or false; and (b) expressions of personal grievance, including Defendant's repeated characterization of Plaintiff's conduct as a "betrayal," which are pleaded solely as background and context—with respect to actual malice—and not as independent bases for liability.

64.     The contextual statements pleaded are alleged to demonstrate Defendant's motive, knowledge, intent, and state of mind, including Defendant's longstanding personal animus toward Plaintiff, Defendant's fixation on attributing blame for the verdict to Plaintiff, and Defendant's knowing or reckless disregard for the truth.

65.     Defendant's repetition and escalation of these statements across multiple platforms, together with her stated intent to cause Plaintiff to "face consequences," are pleaded to demonstrate Defendant's actual malice, knowing or reckless disregard of the truth, and the purely private, retaliatory nature of the dispute underlying Defendant's conduct.

66.     Defendant's conduct, including the public dissemination of false accusations of criminal conduct and professional misconduct against Plaintiff, was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized society.

## COUNT I
### (Libel *Per Se* and Defamation – NY Post and Variety Articles)

**67.**     Plaintiff restates and realleges the preceding allegations as if fully set forth herein.

**68.**     On or about June 13 and 14, 2025, the New York Post and Variety published Defendant's statements made to each periodical, which included the following false statements of fact concerning Plaintiff:

a.     In the New York Post, Defendant accused Plaintiff of falsifying evidence, falsely claimed  that she had written about Weinstein raping her elsewhere in her diaries and that Plaintiff had withheld and/or suppressed those entries, stating she "*wrote about Weinstein's alleged rape in other diaries that she no longer has access to*", and, referencing her claims thatPlaintiff suppressed evidence stated, "*[Plaintiff] manipulated the situation and chose this one workbook.*";

b.     In Variety, Defendant accused Plaintiff of falsifying evidence, made the false claim she had written about being raped by Weinstein elsewhere in her diaries and that Plaintiff had withheld and/or suppressed those diary entries, stating she "*had written about Weinstein's abuse in other diaries, but those were not read for the jury*", and regarding her accusations that Plaintiff  "suppressed evidence", stated, "*My sister chose to bring this one thing from Poland that said what said what it said.*";

c.     In Variety, Defendant made false statements about money for the first time, stating, "*My sister was trying to do a lot of harmful things to me in the past…A lot of this was correlated with money, so we didn't have — let's say — the best relationship ever.*";

**69.**     These statements were about and concerning Plaintiff, were made without qualification, and, with the exception of the statement about the quality of their relationship, were presented as assertions of fact, not opinion, metaphor, or rhetorical hyperbole.

70.     Each of the foregoing statements is false.

71.     Each of the foregoing statements was published by the New York Post and Variety with Defendant's knowledge, consent and encouragement.

72.     Each of the above statements exposed Plaintiff to public hatred, shame, contempt, ridicule, aversion, ostracism, degradation, and disgrace and gave readers an evil opinion of Plaintiff.

73.     As described herein, Defendant acted with actual malice and/or reckless disregard for the truth, including by publishing statements she knew to be false or as to which she entertained serious doubts as to their truth.

74.     Defendant's false statements were made with conscious disregard for Plaintiff's rights and with the intent to injure Plaintiff, without regard for the accuracy or veracity of the statements.

75.     Defendant's actual malice is demonstrated by her refusal to speak to Plaintiff after Plaintiff exposed Defendant's substance abuse disorder and Defendant's lawyer's attempts to influence incomplete testimony to a Court, along with her repeated and escalating statements about Plaintiff across multiple podcast appearances following the Instagram publication, including, but not limited to, *The Viall Files* (July 9, 2025), *Barely Famous* (August 1, 2025), *She Pivots* (September 24, 2025), and *Really Famous with Kara Mayer Robinson* (October 15, 2025).

76.     In those podcast appearances, Defendant repeatedly characterized Plaintiff's conduct as a personal "betrayal," rather than as neutral or factual commentary, and used that framing to reinforce a narrative of disloyalty, sabotage, and hostility toward Plaintiff, including by attributing moral blame to Plaintiff for the outcome of the Weinstein trial.

77.     Defendant's actual malice is further evidenced by her express statements demonstrating retaliatory intent, response, i.e., on *The Viall Files*, when after being asked whether Plaintiff had faced consequences for the alleged falsification of medical records, Defendant responded that she was "working on that." This statement reflects Defendant's intent to cause professional and reputational harm to Plaintiff irrespective of the truth of the accusations.

78.     Defendant's repetition of these accusations across multiple platforms, after having full knowledge that Plaintiff's conduct consisted solely of compelled compliance with her duty to tell the truth under oath in a Court of law, demonstrates Defendant's knowing and/or reckless disregard for the truth, her personal animus toward Plaintiff, and her use of false allegations as a means of punishment rather than commentary on matters of public concern.

79.     Moreover, Defendant's defamatory statements falsely accused Plaintiff of specific criminal conduct, and suppression of and/or tampering with evidence, and directly attacked Plaintiff's moral turpitude by alleging suppression of evidence and attempting to hurt Defendant on money issues. Such statements constitute libel *per se*.

80.     Defendant's false statements have caused actual harm to Plaintiff's cardiology practice, including damage to her professional reputation, patient relationships, and her standing within the medical community including, but not limited to, with patients internationally.

81.     Defendant's conduct has caused and will continue to cause immediate and irreparable injury to Plaintiff, including loss of goodwill, erosion of her professional standing, emotional distress, and economic harm, for which there is no adequate remedy at law.

82.     As detailed herein, Defendant's conduct complained of was willful and wanton.

83.     Accordingly, Plaintiff Ewa Sokola is entitled to judgment awarding special damages, compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs as permitted by law, and such other and further relief as the Court deems just and proper.

<u>**COUNT II**</u>
**(Libel *Per Se* and Defamation – Instagram Post and Daily Mail)**

84.     Plaintiff restates and realleges the preceding allegations as if fully set forth herein.

85.     On or about June 21–23, 2025, Defendant published an Instagram post to over 8,000 followers, which included the following false statements of fact concerning Plaintiff:

a.     *She got drunk, seduced and slept with a man that proposed to me* [sic]*;*

b.     *Stoled 5 numbers of $ from my account* [sic];

c.     *Stoled my sons passport* [sic];

d.     *Ewa is supposed to be a doctor- by falsification of medical documentation she should have her right to be a medical doctor taken away*; and

e.     *She was accused of a death of a child which was hushed in my family.*

86.     On or about June 21, 2025, Defendant was quoted in the Daily Mail, saying "[Plaintiff] sole his passport from my house, she stole all of [Defendant's Child's] IDs.

87.     These statements were of and concerning Plaintiff, were made without qualification, and were presented as assertions of fact, not opinion, metaphor, or rhetorical hyperbole.

88.     Each of the foregoing statements is false.

89.     Each of the foregoing statements on Instagram were published by Defendant to her Instagram audience of over 8,000 followers.

90.     The foregoing statement in the Daily Mail was published to its numerous readers.

91.     Each of the above statements exposed Plaintiff to public hatred, shame, contempt, ridicule, aversion, ostracism, degradation, and disgrace and gave viewers and/or readers an evil opinion of Plaintiff.

92.     As described herein, Defendant acted with actual malice and/or reckless disregard for the truth, including by publishing statements she knew to be false or as to which she entertained serious doubts as to their truth.

93.     Defendant's false statements were made with conscious disregard for Plaintiff's rights and with the intent to injure Plaintiff, without regard for the accuracy or veracity of the statements.

94.     Defendant's actual malice is demonstrated by her refusal to speak to Plaintiff after Plaintiff exposed her substance abuse disorder, Defendant's lawyer's attempt to influence incomplete testimony to a Court, and Defendant's repeated and escalating statements about Plaintiff across multiple podcast appearances following the Instagram publication, including, but not limited to, *The Viall Files* (July 9, 2025), *Barely Famous* (August 1, 2025), *She Pivots* (September 24, 2025), and *Really Famous with Kara Mayer Robinson* (October 15, 2025).

95.     In those podcast appearances, Defendant repeatedly characterized Plaintiff's conduct as a personal "betrayal," rather than as neutral or factual commentary, and used that framing to reinforce a narrative of disloyalty, sabotage, and hostility toward Plaintiff, including by attributing moral blame to Plaintiff for the outcome of the Weinstein trial.

96.     Defendant's actual malice is further evidenced by her express statements demonstrating retaliatory intent, including her response on *The Viall Files*; when asked whether Plaintiff had faced consequences for the alleged falsification of medical records, Defendant

responded that she was "working on that." This statement reflects Defendant's intent to cause professional and reputational harm to Plaintiff irrespective of the truth of the accusations.

97.    Defendant's repetition of these accusations across multiple platforms, after having full knowledge that Plaintiff's conduct consisted solely of compelled compliance with her duty to tell the truth under oath in a Court of law, demonstrates Defendant's knowing or reckless disregard for the truth, her personal animus toward Plaintiff, and her use of false allegations as a means of punishment rather than commentary on matters of public concern.

98.    Moreover, Defendant's defamatory statements falsely accused Plaintiff of specific criminal conduct, including homicide and theft; impugned Plaintiff's chastity; and directly attacked Plaintiff's professional integrity and fitness to practice medicine by alleging falsification of medical records and calling for revocation of Plaintiff's medical license. Such statements constitute libel *per se*.

99.    Defendant's false statements have caused actual harm to Plaintiff's cardiology practice, including damage to her professional reputation, patient relationships, and her standing within the medical community.

100.    Defendant's conduct has caused and will continue to cause immediate and irreparable injury to Plaintiff, including loss of goodwill, erosion of her professional standing, emotional distress, and economic harm, for which there is no adequate remedy at law.

101.    As detailed herein, Defendant's conduct complained of was willful and wanton.

102.    Accordingly, Plaintiff Ewa Sokola is entitled to judgment awarding special damages, compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs as permitted by law, and such other and further relief as the Court deems just and proper.

## <u>COUNT III</u>
### (Slander *Per Se* and Defamation – The Viall Files Interview)

**103.**     Plaintiff restates and realleges the preceding allegations as if fully set forth herein.

**104.**     On or about July 9, 2025, an episode of *The Viall Files*, Episode 963, *Going Deeper with Kaja Sokola*, was published, wherein Defendant appeared as a guest and made the following false statements of fact concerning Plaintiff:

   a.     [*She*] *slept with a guy who proposed to me;*

   b.     *Stole a lot of money from my bank account*; and

   c.     *she falsified medical documents and sent them to the prosecutors who said, we can obviously see that this is made up*.

**105.**     These statements were of and concerning Plaintiff, were made without qualification, and were presented as assertions of fact, not opinion, metaphor, or rhetorical hyperbole.

**106.**     Each of the foregoing statements is false.

**107.**     Each of the foregoing statements was made with the knowledge and intent that they would be heard by listeners of *The Viall Files*.

**108.**     Each of the above statements exposed Plaintiff to public hatred, shame, contempt, ridicule, aversion, ostracism, degradation, and disgrace, and gave listeners a contemptible opinion of Plaintiff.

**109.**     As described herein, Defendant acted with actual malice and/or reckless disregard for the truth, including by publishing statements she knew to be false or to which she entertained serious doubts as to their truth.

110.    Defendant's false statements were made with conscious disregard for Plaintiff's rights and with the intent to injure Plaintiff, without regard for the accuracy or veracity of the statements.

111.    Defendant's actual malice is evidenced by her refusal to speak to Plaintiff after Plaintiff exposed her substance abuse disorder, Defendant's lawyer's attempt to influence incomplete testimony to a Court, and Defendant's express statements demonstrating retaliatory intent during *The Viall Files* episode, including her response, when asked whether Plaintiff had faced consequences for the alleged falsification of medical records, that she was "working on that." This statement reflects Defendant's intent to cause professional and reputational harm to Plaintiff irrespective of the truth of the accusation.

112.    Defendant's actual malice is evidenced by her continuation of making defamatory statements despite the service of two good faith letters.

113.    Defendant's repetition of these accusations across multiple platforms, after having full knowledge that Plaintiff's conduct consisted solely of compelled compliance with her duty to tell the truth under oath in a Court of law, demonstrates Defendant's knowing or reckless disregard for the truth, her personal animus toward Plaintiff, and her use of false allegations as a means of punishment rather than commentary on matters of public concern.

114.    Moreover, Defendant's defamatory statements falsely accused Plaintiff of specific criminal conduct, including theft; impugned Plaintiff's chastity; and directly attacked Plaintiff's professional integrity and fitness to practice medicine by alleging falsification of medical records and calling for revocation of Plaintiff's medical license. Such statements constitute libel *per se*.

115.    Defendant's false statements have caused actual harm to Plaintiff's cardiology practice, including damage to her professional reputation, patient relationships, and her standing within the medical community.

116.    Defendant's conduct has caused and will continue to cause immediate and irreparable injury to Plaintiff, including loss of goodwill, erosion of professional standing, emotional distress, and economic harm, for which there is no adequate remedy at law.

117.    As detailed herein, Defendant's conduct complained of was willful and wanton.

118.    Accordingly, Plaintiff Ewa Sokola is entitled to judgment awarding compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs as permitted by law, and such other and further relief as the Court deems just and proper.

### COUNT IV
### (Intentional Infliction of Emotional Distress)

119.    Plaintiff restates and realleges the preceding allegations as if fully set forth herein.

120.    Defendant engaged in a deliberate, sustained campaign of public accusations against Plaintiff, a private individual residing abroad, through social media and widely distributed podcasts, accusing Plaintiff of criminal conduct, professional misconduct, moral turpitude, and betrayal in connection with highly publicized criminal proceedings in which Plaintiff was merely a compelled witness.

121.    Defendant's conduct as complained of herein, including falsely accusing Plaintiff of homicide, theft, falsification of medical records, sexual impropriety and immoral conduct, and collusion with a criminal defendant's legal team; publicly calling for the revocation of Plaintiff's medical license; and repeatedly attributing blame to Plaintiff for the outcome of a criminal trial, was extreme and outrageous, exceeded all bounds of decency, and was utterly intolerable in a civilized society.

122.    Defendant's conduct as complained of herein was not an isolated outburst or momentary lapse of judgment, but a calculated and escalating course of action carried out across multiple platforms over several months, following Defendant's dissatisfaction with the outcome of the Weinstein retrial and motivated by longstanding personal animus toward Plaintiff.

123.    Defendant knew that Plaintiff had testified truthfully as a prosecution witness, and had no control over the use of any materials at trial, yet Defendant nevertheless persisted in publicly portraying Plaintiff as a malicious actor and personal adversary.

124.    Defendant's conduct as complained of herein was committed intentionally, knowingly, willfully, and maliciously, and at a minimum, with reckless disregard of the near certainty that such conduct would cause Plaintiff severe emotional distress, humiliation, reputational harm, and professional injury.

125.    Defendant's retaliatory intent is further evidenced by her express statements demonstrating a desire to cause Plaintiff to "face consequences," including statements made during a widely disseminated podcast appearance indicating that Defendant was actively "working on" causing professional repercussions for Plaintiff.

126.    As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including anxiety, humiliation, emotional anguish, and distress associated with threats to her professional standing, reputation, and personal safety.

127.    Plaintiff's emotional distress is genuine, serious, and of a nature that no reasonable person should be expected to endure, particularly given Plaintiff's status as a medical professional whose reputation for integrity and trustworthiness is essential to her livelihood.

**128.** Defendant's conduct served no legitimate purpose, did not constitute protected commentary on a matter of public concern, and instead arose from a purely private, intra-family dispute marked by resentment, retaliation, and hostility.

**129.** Defendant's conduct was the sole proximate cause of Plaintiff's emotional injuries, and such injuries were foreseeable, intended, and exacerbated by Defendant's repeated republication of accusations after having full knowledge of their falsity.

**130.** Accordingly, Plaintiff is entitled to recover compensatory damages for severe emotional distress, humiliation, and mental suffering, as well as punitive damages sufficient to punish Defendant's willful misconduct and to deter similar conduct in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ewa Sokola respectfully requests that judgment be entered in her favor and against Defendant Kaja Sokola, and that the Court grant the following relief:

**a)** A declaration that Defendant's false statements published on Instagram, in the NY Post, Variety and the Daily Mail constitute libel *per se* against Plaintiff;

**b)** A declaration that Defendant's false statements made during her appearance on *The Viall Files* podcast constitute slander *per se* against Plaintiff;

**c)** A finding that Defendant committed intentional infliction of emotional distress against Plaintiff;

**d)** An order directing Defendant to retract the defamatory statements identified herein, in a form and manner reasonably calculated to reach the same audience to whom the defamatory statements were published;

**e)** An award of special damages equaling the quantifiable losses to Plaintiff's reputation (the sum of which is expected to exceed $75,000), including presumed damages for

23

libel *per se*, general damages for reputational harm, emotional distress damages, and special damages to the extent proven at trial;

      **f)**     An award of punitive damages in a lawful amount for Defendant's conduct against Plaintiff;

      **g)**     Permanent injunctive relief prohibiting Defendant from repeating, republishing, or further disseminating the defamatory statements alleged herein, or substantially similar statements imputing criminal conduct, professional misconduct, or moral turpitude to Plaintiff;

      **h)**     An award of Plaintiff's costs and disbursements, including reasonable attorneys' fees to the extent permitted by law;

      **i)**     Pre- and post-judgment interest as permitted by law; and

      **j)**     Such other and further relief as the Court deems just and proper.

Dated: December 23, 2025        Respectfully submitted,

                                    Daniel J. Schneider, DS7366
                                    OFFIT KURMAN, P.A.
                                    590 Madison Ave., 6th Floor
                                    New York, New York
                                    (212) 545-1900 telephone
                                    (212) 545-1656 fax
                                    daniel.schneider@offitkurman.com

                                    Mark J. Dimenna (*pro hac vice* to be filed)
                                    OFFIT KURMAN, P.A.
                                    1954 Greenspring Drive, Suite 605
                                    Timonium, Maryland 21093
                                    (410) 209-6411 telephone
                                    (410) 209-6435 fax
                                    mark.dimenna@offitkurman.com

                                    *Counsel for Plaintiff*